*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, HARRELL, and KORN
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Troy K. WILLIAMS**
Staff Sergeant (E-6), U.S. Marine Corps
*Appellant*

**No. 202400331**

_____

Decided: 28 April 2026

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Adam Subervi (arraignment)
Benjamin B. Garcia (motions and trial)

Sentence adjudged 15 March 2024 by a general court-martial tried at Marine Corps Air Station Iwakuni, Japan. Sentence in the Entry of Judgment: confinement for three months, restriction to base for two months, and hard labor without confinement for three months.

For Appellant:
*Captain Arthur L. Gaston III, JAGC, USN (on brief)*
*Captain Kyle W. Rodewald, USMC (argued)*

For Appellee:
*Lieutenant K. Matthew Parker, JAGC, USN (on brief)*
*Captain Jacob R. Carmin, USMC (argued)*

Amicus Curiae for Appellant:
*Charlton J. Meginley, John C. Phillips, Andrey A. Loria Calvo, Lillian
K. Thomas, Brittany E. White (on brief)*
*Madison T. Keyser (argued)*

Amicus Curiae for Appellee:
*Charlton J. Meginley, John C. Phillips, Connor J. Hebert, Reed M.
Renfrow, Kyle M. Savoy (on brief)*
*Captain Kurt S. Ebert, USMC (argued)*

Judge KORN delivered the opinion of the Court, in which Chief Judge
DALY and Senior Judge HARRELL joined.[1]

_____

**This opinion does not serve as binding precedent but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

KORN, Judge:

A general court-martial composed of members with enlisted representation
convicted Appellant of one specification of communicating a threat and one
specification of domestic violence in violation of Articles 115 and 128b, Uniform
Code of Military Justice (UCMJ).[2] Appellant was found not guilty of seven
other specifications of domestic violence. The members sentenced Appellant to
confinement for three months, restriction to base for two months, and hard
labor without confinement for three months.

---

[1] We held oral argument on 18 March 2026 at The Louisiana State University Paul
M. Hebert Law Center as part of the Court's outreach program. We are extremely appreciative of the law school graciously hosting and organizing this event. We further
commend the efforts of the students at the Veterans Law Clinic, under the supervision
of Professors Charlton J. Meginley and John C. Phillips, for their highly professional
and effective briefs and outstanding oral arguments.

[2] 10 U.S.C. §§ 915, 928b.

Appellant raises four assignments of error (AOE), which we renumber as follows:

**I. Whether the military judge abused his discretion in admitting hearsay under the residual hearsay exception, Military Rule of Evidence (Mil. R. Evid.) 807.**

**II. Whether the military judge abused his discretion in admitting excerpts of the complaining witness's interview with NCIS under Mil. R. Evid. 801(d)(1)(B)(i) despite finding she made the statements after her motive to fabricate arose.**

**III. Whether this Court can conduct a factual sufficiency review where the members returned ambiguous findings.**

**IV. Whether the evidence is factually sufficient to sustain Appellant's conviction for domestic violence.**

We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

Appellant was convicted of domestic violence by committing a violent offense against his wife, Dee,[3] and of communicating a threat by threatening to kill her. These convictions stemmed from an incident where Appellant became angry that his children were being too loud, and he felt that Dee was not doing enough to quiet them. Appellant eventually grabbed Dee and put his hands around her neck and over her mouth, then threatened to kill her. Two of their children, Sierra and Alice, witnessed this incident.

At trial, Dee testified about the event in question and other charged misconduct. Defense counsel then cross-examined her about her motivations for testifying against Appellant, suggesting that she lied to gain leverage in a divorce and child custody proceeding. Following this cross-examination, the Government offered portions of Dee's interview with the Naval Criminal Investigative Service (NCIS) as prior consistent statements. The military judge admitted this evidence, over Defense objection, under Mil. R. Evid.

---

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

801(d)(1)(B)(i), finding that "it serves to rebut the implied charge" that her testimony was based on "the risk and danger to her custody of her children, to her other outcomes in the divorce proceedings such as alimony and child support."[4]

The Government called both Sierra and Alice to testify at trial. Both children had great difficulty recalling the events in question, but Alice was able to recall a bit more than her sibling, describing Appellant putting his hand around Dee's neck.[5] After Sierra's and Alice's testimony, the Government moved to introduce their recorded child forensic interviews (CFI) into evidence under Mil. R. Evid. 807, the residual hearsay exception, to prove that Appellant assaulted his wife and threatened to kill her. Appellant objected to this evidence, and the military judge sustained the objection to Sierra's CFI but overruled the objection to Alice's. He found that Alice's CFI, which occurred when she was four years old, "is more probative of the point that's offered than any other evidence that the proponent can obtain by reasonable efforts."[6]

## II. DISCUSSION

### A. The military judge abused his discretion when he admitted testimony under Mil. R. Evid. 807, but Appellant suffered no prejudice.

*1. Standard of Review*

Rulings to admit evidence are reviewed for an abuse of discretion.[7] It is an abuse of discretion when the military judge (1) predicates a ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) fails to consider important facts.[8]

*2. Analysis*

Mil. R. Evid. 807 is titled "residual exception." It allows for the admissibility of hearsay statements "in rare circumstances"[9] when:

---

[4] R. at 1188.

[5] R. at 1290.

[6] R. at 1316.

[7] *United States v. Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)).

[8] *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022).

[9] *United States v. Czachorowski*, 66 M.J. 432, 435 (C.A.A.F. 2008).

(1) the statement is supported by sufficient guarantees of trust-worthiness—after considering the totality of the circumstances under which it is made and evidence, if any, corroborating the statement; and

(2) the statement is more probative on the point for which it was offered than any other evidence that the proponent can obtain through reasonable efforts.[10]

The Government offered Alice's CFI for two reasons: (1) "to prove the material facts surrounding the charged conduct that occurred on 31 January 2023, specifically that [Appellant] did put his hand around [Dee's] throat and over [her] mouth and that he stated he wanted to kill . . . [Dee];"[11] and (2) because the CFI "provides in more detail the particularity for which [Alice] . . . remembered the incident three days post-event."[12]

The military judge determined that the first prong of Mil. R. Evid. 807—that the statement was supported by sufficient guarantees of trustworthiness—was satisfied for multiple reasons. These included that Alice provided "a series of significant and probative unprompted statements,"[13] there was "no notable evidence of coaching . . . and there are some contra indications of coaching,"[14] the interviewer used open-ended questions,[15] and Alice willingly told the interviewer when she didn't know the answer and corrected him when he misunderstood her.[16] We agree with the military judge and conclude that he did not abuse his discretion in determining that Alice's CFI was supported by sufficient guarantees of trustworthiness.[17]

Appellant argues that the military judge abused his discretion by finding that Alice's CFI was more probative on the point for which it was offered than any other evidence available to the Government. Specifically, Appellant argues that Dee "testified at length to the material facts in the case and *her* testimony

---

[10] Mil. R. Evid. 807.

[11] App. Ex. X at 20.

[12] R. at 1297–98.

[13] R. at 1474–75.

[14] R. at 1475.

[15] R. at 1473.

[16] R. at 1474.

[17] Appellant does not challenge this finding on appeal.

was the more probative evidence of those facts than Alice's out-of-court statements during the interview."[18] We agree.

The military judge erred in his application of the second prong of Mil. R. Evid. 807, as Alice's CFI was not more probative on the point for which it was offered than any other evidence that the Government could obtain through reasonable efforts. "The [second] prong may be satisfied where a witness cannot remember material facts and there is *no other more probative evidence of those facts.*"[19] That was not the case here.

Alice provided minimal information in her CFI. The interviewer, the transcriptionist, and this Court all had difficulty understanding her speech. When her statements were intelligible, they offered few details and never provided evidence that hadn't already been provided in significantly greater particularity through Dee's testimony. Although Alice provided limited corroboration, at no time did she offer additional context, specificity, or circumstances to Dee's testimony.

Before the military judge admitted the CFI, Alice testified as a government witness. Her testimony on direct examination takes up approximately two pages in the transcript. She testified that she did not remember her parents arguing but that she remembered Appellant putting his hand around her mother's neck. Trial counsel asked her no questions about Appellant threatening to kill Dee. Trial counsel was unable to immediately orient Alice to the charged offenses. That was similar, though, to what occurred in the CFI, where Alice was frequently distracted and her answers were difficult to understand, requiring constant clarifying follow-up questions and reorientation. Trial counsel, however, made minimal efforts to focus Alice's attention on the charged offenses. Because of the limited questions posed to Alice on direct examination, we are not convinced that Alice's CFI was more probative than her own in-court testimony would have been had trial counsel made the "reasonable efforts" required by Mil. R. Evid. 807 and asked additional questions.

We need not determine whether the military judge abused his discretion by finding that Alice's CFI provided more probative evidence than her own in-court testimony, however, as the more critical question is whether the CFI was more probative on the point for which it was offered than Dee's testimony. It was not. Dee testified at length to the material facts about the charged assault and threat, and her testimony produced significantly more probative evidence

---

[18] Appellant's Brief at 29 (emphasis in original).

[19] *United States v. Jackson,* 2017 CCA LEXIS 758, at *11 (N-M Ct. Crim. App. Dec. 19, 2017) (unpublished) (internal citations omitted) (emphasis added).

than Alice's CFI. Although it is true that "[e]ven though residual hearsay may be 'somewhat cumulative, it may be important in evaluating other evidence and arriving at the truth,'"[20] Alice's CFI did not provide significant corroborative evidence due to its limited substance. We agree with Appellant that "[t]he sworn, in-court testimony of [Dee] is far more probative on the question of whether she was assaulted . . . than an unsworn, out-of-court video interview of a child observer who later cannot remember everything while testifying on the stand."[21]

In determining that Alice's CFI provided more probative evidence on the point for which it was offered than any other evidence that the Government could obtain, the military judge erred by applying the law to the facts in a way that was clearly unreasonable. We therefore must determine whether that error was materially prejudicial to Appellant's rights. When a military judge errs in admitting evidence, "the government bears the burden of demonstrating that the admission of that erroneous evidence was harmless."[22] The analysis depends on the strength of the Government and Defense cases and the materiality and quality of the erroneously-admitted evidence.[23] To determine the materiality and quality of the evidence, we assess how much it may have affected the court-martial.[24]

Both the Government and Defense cases were relatively strong. The Government's case revolved largely around Dee, who testified credibly about Appellant's behavior. Some of the incidents about which she testified included corroborating evidence, most notably the altercation on 31 January, which led to an immediate report, officers observing her in a distressed state, and supporting medical documentation. Defense, on the other hand, effectively attacked Dee's credibility, arguing that she was fabricating the allegations against Appellant to gain leverage in ongoing divorce and custody proceedings. The mixed findings in this case indicate that both sides presented strong cases and Defense's efforts damaged, but did not destroy, Dee's credibility.

---

[20] *United States v. Kelley*, 45 M.J. 275, 280 (C.A.A.F. 1996) (quoting *United States v. Shaw*, 824 F.2d 601, 610 (8th Cir. 1987)).

[21] Appellant's Reply at 3.

[22] *United States v. Finch*, 79 M.J. 389, 398 (C.A.A.F. 2020) (citing *United States v. Frost*, 79 M.J. 104, 111 (C.A.A.F. 2019).

[23] *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

[24] *See United States v. Washington*, 80 M.J. 106, 111 (C.A.A.F. 2020).

Turning to the materiality and quality of Alice's CFI, we conclude that while material, it is not of significant quality. That lack of quality is due primarily to the limited amount of information it contains. Additionally, Alice provided some of that same information during her testimony at trial. Appellant argues that "the erroneous admission of the child forensic interview substantially influenced the findings,"[25] and "the Government made [Alice's CFI] the linchpin of its case."[26] We disagree on both points.

To demonstrate the importance of the evidence, Appellant focuses on how many times trial counsel played clips of it during closing argument (five times). But the frequency with which trial counsel referred to Alice's CFI during closing argument does not affect the *substance* of the CFI, which was relatively inconsequential. The entire interview lasted less than 30 minutes. Much of the conversation between Alice and the interviewer was unrelated to the charged misconduct, and the majority of what Alice said was very difficult, if not impossible, to understand. There was therefore only a limited amount of the CFI that related to the allegations for which Appellant was convicted. Additionally, Alice had already testified before the members, where she demonstrated Appellant putting his hand around Dee's throat.

Appellant's argument that "the Government made [Alice's CFI] the linchpin of its case" is belied by a review of the record. Although the Government played clips from Alice's CFI five times throughout the 85-minute closing argument, the combined length of those clips was a mere 82 seconds. Hardly a linchpin, much less an effective one. Furthermore, much of the CFI played during the Government's closing argument contained nothing of substance at all, instead involving the interviewer questioning Alice or following up in an effort to understand her answers. And regarding the portions of the CFI where the interviewer was speaking, the military judge instructed the members that

> [Alice's] answers are the substantive evidence in the exhibit. What that means is, you must come to your own conclusion about what her statements and answers are. To the extent that . . . [the interviewer's] questions can inform that, such as when he attempts to restate what she said, and she either agrees or tells him no, you [can] consider his question in interpreting her

---

[25] Appellant's Brief at 29.

[26] Appellant's Brief at 30.

answer. But . . . you cannot simply adopt or accept his interpre-
tation. His question and the statements are only useful to you to
the extent they inform [Alice's] answers and statements.[27]

Therefore, considering the limited information contained in the CFI, how dif-
ficult Alice was to understand, and the way the members were able to consider
the interviewer's comments,[28] Alice's CFI was of very limited consequence.

Because Alice's CFI contained minimal evidence, some of which came in
previously through her testimony, the quality of the erroneously admitted ev-
idence was extremely low. We therefore conclude that although the military
judge abused his discretion in admitting Alice's CFI under Mil. R. Evid. 807,
that error was harmless because it did not prejudicially influence the court-
martial.

**B. The military judge did not abuse his discretion in admitting ex-
cerpts of Dee's interview with NCIS under Mil. R. Evid. 801(d)(1)(b)(i).**

*1. Standard of Review*

A military judge's decision to admit evidence under Mil. R. Evid.
801(d)(1)(B)(i) is reviewed using the same abuse of discretion analysis that we
applied in the previous section.

*2. Analysis*

Mil. R. Evid. 801(d)(1)(B)(i) provides that a declarant witness's prior con-
sistent out-of-court statement is not hearsay if offered to rebut an express or
implied charge that the declarant recently fabricated it or acted from a recent
improper influence or motive in so testifying.[29] To be admissible under Mil. R.
Evid. 801(d)(1)(B)(i), "the prior statement, admitted as substantive evidence,
must precede any motive to fabricate or improper influence that it is offered to
rebut."[30] "[W]here multiple motives to fabricate . . . are asserted, the statement
need not precede all such motives or influences, but only the one it is offered to

---

[27] R. at 1765.

[28] *See, e.g., United States v. Baumann*, 54 M.J. 100, 105 (C.A.A.F. 2000) (concluding
that an error was harmless in part because the military judge gave "extensive instruc-
tions on the proper use" of the evidence).

[29] *United States v. Ruiz*, 86 M.J. 75, 80 (C.A.A.F. 2024).

[30] *United States v. Ayala*, 81 M.J. 25, 28–29 (C.A.A.F. 2020) (quoting *Frost*, 79 M.J.
at 110).

rebut."[31] "If the statement occurred after the motive arose, then the declarant's consistency signifies nothing."[32]

Defense attacked Dee's credibility on the basis that she had a motive to fabricate the allegations against Appellant to gain an advantage in divorce and custody proceedings. The Government offered portions of Dee's interview with NCIS as prior consistent statements under the theory that actual divorce proceedings did not start until approximately five months *after* Dee spoke with NCIS (and were initiated by Appellant, not by Dee), so the defense-identified motive to fabricate did not exist at the time of the interview. Defense countered this argument with the contention that the motive to fabricate already existed at the time of the NCIS statement, as Appellant had previously informed his wife of his intention to seek a divorce. The military judge ultimately overruled the Defense objection and admitted the interview portions into evidence, finding that although

> [t]he defense presented a central motive arising [before the NCIS interview] where divorce began to be considered and [Dee] began to consider how allegations might affect divorce proceedings. . . . [Her statement to NCIS] serves to rebut the implied charge that improper influences specifically be increased stakes, the risk and danger to her custody of her children, to her other outcomes in the divorce proceedings such as alimony and child support, that it demonstrates that the escalation in the divorce proceedings has not changed the central testimony she's provided this Court and therefore it does serve to rebut those implied charges under 801(d)(1)(B)(i).[33]

Although the military judge described the "escalation" of the original motive to fabricate rather than concluding that the pending proceedings provided

---

[31] *Id.* at 29 (quoting *Frost*, 79 M.J. at 110).

[32] *Id.*

[33] R. at 1185–88. At oral argument, Appellee disputed Appellant's contention that the military judge made a finding of fact that Dee's motive to fabricate began when the topic of divorce first arose prior to the NCIS interview, arguing that the military judge merely recognized—as opposed to finding—that Defense presented evidence that a motive to fabricate existed at that time. We acknowledge that the military judge's ruling is somewhat ambiguous on this point. However, it appears from our reading of the record that the military judge did intend to make a finding of fact that a motive to fabricate existed in January of 2023 (and then increased as divorce proceedings began). However, since we conclude that the military judge did not abuse his discretion in admitting the prior consistent statement, our ultimate decision would not change even if we agreed with Appellee.

an additional or different motive to fabricate, we agree with his ultimate conclusion. The record establishes that Appellant initially mentioned the word "divorce" during a conversation with Dee in January of 2023. However, there is a substantial difference between the general topic of divorce coming up during a disagreement between spouses and the actual filing for divorce and initiation of a custody dispute. The military judge therefore did not abuse his discretion, as the filing and progressing of divorce proceedings constituted a more recent improper influence than the one that existed when Appellant merely mentioned divorce.

Defense made the ongoing divorce and custody proceedings the cornerstone of its case. We need look no further than Defense's cross-examination of Dee to confirm how critical the nature of the divorce proceedings *at the time of the court-martial* was to Defense's theory: "This entire family court matter is pending the outcome of this court-martial, isn't it?"[34] Defense later asked her, "You're worried that if there's an acquittal in this trial, that [Appellant] might get custody of the children?"[35] Also, in closing argument, Defense told the members, "She's trying to use all eight of you to get a verdict against her husband so she can take that piece of paper . . . and obtain custody . . . of her children and never see her husband again. . . . [S]he wants to show violence against her children so she can show this to a judge, not this judge, a family court judge."[36]

Allowing Appellant to allege that Dee fabricated her testimony to impact the pending divorce and custody proceedings—which had not yet been initiated at the time of her NCIS interview—without allowing the Government to demonstrate that the allegations had remained consistent since before those proceedings began would allow Defense to have its cake and eat it too. For although Appellant argues that "it is the same improper motive—considerations of divorce proceedings—which the military judge found to have arisen in early January 2023,"[37] Defense did not cross-examine Dee about "considerations of divorce proceedings." Instead, Defense zealously cross-examined Dee about how she intended to use the results of the court-martial in her ongoing family court trial. Defense then focused on this motive to fabricate in closing argument, repeatedly telling the members that Dee would immediately use a guilty verdict to attempt to obtain full custody of her children.

---

[34] R. at 884.

[35] R. at 934.

[36] R. at 1991–93.

[37] Appellant's Brief at 36.

Dee's NCIS statement preceded the improper influence or motive asserted by Defense–the divorce filing, custody battle, and family court proceeding, which, again, *were initiated by Appellant.* The military judge therefore did not abuse his discretion in finding that the admitted portions of the NCIS statement were admissible under Mil. R. Evid. 801(d)(1)(B)(i) to rebut the express or implied charge that she testified falsely due to a recent improper influence or motive.

Even if the military judge abused his discretion by admitting portions of Dee's NCIS interview, we would still have to determine whether that error was materially prejudicial to Appellant's substantial rights. When a military judge errs in allowing evidence to be admitted, the "government bears the burden of demonstrating that the admission of that erroneous evidence was harmless."[38] The analysis depends on the strength of the government and defense cases and the materiality and quality of the erroneously-admitted evidence.[39] To determine the materiality and quality of the evidence, we assess how much it may have affected the court-martial.[40] As analyzed in greater detail with regards to AOE I in the previous section, both the Government and Defense cases were relatively strong, as was reflected by the mixed findings by the members.

Appellant argues that the Government's case was weak, and "Defense . . . demonstrated through cross-examination that [Dee] had a compelling motive to fabricate that preceded the report of her allegations against Appellant to NCIS."[41] Appellant further argues that "[T]he Government relied on [Dee's] emotional NCIS interview to secure Appellant's conviction."[42] But if Appellant is correct that Dee's motive to fabricate arose in January 2023, then those two statements are inherently contradictory. If Appellant was successful in demonstrating that Dee had a compelling motive to fabricate the allegations against him, then evidence that her in-court testimony was consistent with her NCIS interview, which occurred after Appellant argues that same motive to fabricate arose, would be of no consequence.[43] Instead, the NCIS statement would be

---

[38] *Finch,* 79 M.J. at 398 (quoting *Frost,* 79 M.J. at 111).

[39] *Kerr,* 51 M.J. at 405.

[40] *See Washington,* 80 M.J. at 111.

[41] Appellant's Brief at 30.

[42] Appellant's Brief at 38.

[43] *See, e.g., United States v. Walker,* 42 M.J. 67, 74 (C.A.A.F. 1995) (concluding that an error was harmless in part because the court was "confident that the members-- using their common sense and everyday experiences--placed this evidence in a proper perspective and did not afford it substantial weight").

entirely cumulative with,[44] and subject to the same motive-to-fabricate impeachment as, her in-court testimony.

Dee testified at great length about Appellant's abuse and threats. Additionally, the general facts about the two charges for which Appellant was convicted were also corroborated by other admitted evidence. This evidence came in through the testimony of the physician's assistant (PA) who treated Dee at the emergency room and Prosecution Exhibit 21, the medical records associated with that visit. Appellant affirmatively declined to object to this evidence.[45] According to the PA, Dee

> said that she was strangulated by her husband twice [on 31 January] . . . . Her husband had been upset, he was yelling, he strangled [her], pushed her against the wall threatening to kill both the patient and two of her children, and she had said at one point that one hand was grasping around her neck and lifting her and the other was covering [her] mouth.[46]

The medical records describe Dee reporting

> being strangulated by her husband twice [on 31 January]. Patient reports her husband got upset . . . prompting yelling and physical aggression . . . patient's husband was strangling the patient . . . . Patient was forcefully pushed against the wall on several occasions . . . with verbal attempts threatening to kill the patient . . . one hand grasping patient's neck . . . while the other hand was covering her mouth. . . . This was not the first time this had happened.[47]

Additionally, despite the fact that Dee described many of the charged offenses in her NCIS interview, Appellant was found not guilty of seven of the nine charged specifications. These findings clearly demonstrate that Dee's NCIS statement did not have a significant impact on the verdict, contradicting Appellant's contention that "the Government relied on the complaining witness's emotional NCIS interview to secure Appellant's conviction."[48]

---

[44] Cumulative testimony is not automatically inadmissible, but the military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of needlessly presenting cumulative evidence. Mil. R. Evid. 403.

[45] R. at 1605.

[46] R. at 1605–06.

[47] Pros. Ex. 21 at 1.

[48] Appellant's Brief at 38.

Although material, the admitted portions of Dee's NCIS statement were not of significant quality. That limited quality is because, if they were improperly admitted under Mil. R. Evid. 801(d)(1)(B)(i), then the same motive to fabricate existed when Dee spoke with NCIS that existed when Defense effectively cross-examined her at trial. The lack of quality is additionally due to the fact that similar evidence came in without objection from the PA and medical records.[49] Dee's NCIS statement therefore did not influence the court-martial, and we conclude that even if the military judge abused his discretion in admitting Dee's statements under Mil. R. Evid. 801(d)(1)(B)(i), that error was harmless.

**C. The findings were not ambiguous, and this Court can conduct a factual sufficiency review.**

*1. Standard of Review*

Whether a verdict is ambiguous, precluding a service court's factual sufficiency review, is a question of law reviewed de novo.[50] We cannot conduct a factual sufficiency review of a conviction if "the findings of guilty and not guilty do not disclose the conduct upon which each of them was based."[51]

*2. Analysis*

Appellant was charged with two similar specifications of domestic violence stemming from two discrete instances that occurred during the altercation on 31 January 2023. The first specification alleged that Appellant committed an assault upon Dee by unlawfully strangling and suffocating her with his hands.[52] The second specification alleged that Appellant unlawfully strangled Dee with his hands.[53] The members found Appellant not guilty of the first specification, but guilty of the lesser included offense of domestic violence by committing a violent offense—assault consummated by a battery—in violation of Article 128b. The members found Appellant not guilty of the second specification.

---

[49] *See, e.g., United States v. Hursey*, 55 M.J. 34, 36 (C.A.A.F. 2001) (concluding that an error was harmless in part because the record was replete with similar admissible evidence).

[50] *United States v. Ross*, 68 M.J. 415, 417 (C.A.A.F. 2010).

[51] *United States v. Walters*, 58 M.J. 391, 397 (C.A.A.F. 2003).

[52] This was Specification 2 of Charge I on the Charge Sheet.

[53] This was Specification 3 of Charge I on the Charge Sheet.

Appellant argues, "The findings in this case are ambiguous because it is not 'possible to determine which act formed the basis of the finding [ ]' of guilty and which act formed the basis of the acquittal."[54] Appellant further argues that "this ambiguity prevents this Court's factual sufficiency review."[55] We disagree. The findings are unambiguous, and we can conduct a proper factual sufficiency review.

Dee testified unambiguously that Appellant assaulted her two separate times on 31 January 2023. First,

> He came into the kitchen and he grabbed me by my neck and started choking me on the wall by the window. . . . He continued to choke me with his hand around my throat and then he put his other hand over my mouth and nose. . . . He, like, squeezed my neck, like, one last time against the wall and then he let me go and he went back into the kitchen.[56]

She also testified that minutes later, Appellant appeared to believe she was preparing to leave the house with the children, and he said "Where the 'f' do you think you're going? You're not 'f-ing' going anywhere." She said Appellant "grabbed me by my neck and took me back to the - - in the little closet to the wall."[57] She further testified that once in the closet, Appellant's hands were "[o]n my neck. . . . He was choking me on that wall and I was trying to scoot to get away from him."[58]

It was clear throughout Appellant's trial that both parties understood the distinction between the two specifications. Appellant moved pretrial for a Bill of Particulars to provide the requisite specificity for certain charges in the case, but notably did not request a Bill of Particulars for the specifications which he now argues resulted in ambiguous findings.[59] The closing arguments of both parties further demonstrated the lack of confusion about the specifications. Regarding the first specification at issue, trial counsel argued, "And then he saw

---

[54] Appellant's Brief at 46 (quoting *United States v. Stewart*, 71 M.J. 38, 43 (C.A.A.F. 2012)).

[55] Appellant's Brief at 47.

[56] R. at 678–80.

[57] R. at 682–83.

[58] R. at 686–87.

[59] App. Ex. XXIX.

trash on the counter. . . . And he grabbed her by the neck, and he pushed her into the shelf under the stairs . . . after he pushed her into the ledge under the stairs, he also covered her nose and mouth. That's suffocation."[60] Trial counsel later argued about the second specification, "That on 31 January, the last offense he committed that day was one final strangulation on his spouse . . . . You know he strangled her in the closet under the stairs because he thought she was going to leave."[61]

It was equally clear from defense counsel's closing argument that he was able to distinguish between the two charged specifications, as he drew clear distinctions between the factual basis of each: "If he had strangled her in the living room [the first specification], why would he need to take her into the closet [the second specification]? If he already threw her against the wall in front of the children and strangled her in the living room [the first specification] which she's claiming, why would he need to take her into a closet away from the children [the second specification]?"[62]

While the two specifications at issue alleged similar conduct and occurred in close temporal and spatial proximity, it is evident that Appellant understood the distinction between them at trial, and we have no difficulty distinguishing between them now. It is clear to us what distinct conduct each specification alleged, and we can discern the specific conduct that formed the basis of Appellant's conviction from the specific conduct that formed the basis of his acquittal. We therefore conclude that the findings were not ambiguous, and do not preclude a proper factual sufficiency review, which we conduct below.

**D. The evidence was factually sufficient to sustain Appellant's conviction for domestic violence.**

*1. Standard of Review*

This "Court may consider whether a finding of guilty is correct in fact upon request of an appellant who makes a specific showing of a deficiency in proof."[63] If an appellant makes such a showing, this "Court may weigh the evidence and determine controverted questions of fact," providing "appropriate deference to

---

[60] R. at 1967.

[61] R. at 1973–74.

[62] R. at 2001.

[63] Art. 66(d)(1)(B), UCMJ, 10 U.S.C. § 866(d)(1)(B).

the fact that the trial court saw and heard the witnesses and other evidence."[64] If this Court is "clearly convinced that the finding of guilty was against the weight of the evidence," we "may dismiss, set aside, or modify the finding, or affirm a lesser finding."[65]

*2. Analysis*

We must first consider whether Appellant has made a specific showing of a deficiency in proof. Appellant asserts the following as a specific deficiency of proof: "[T]he Government presented weak, conflicting, and uncorroborated evidence to support its theory that Appellant did, in fact, unlawfully place his hands on the complaining witness's neck and her mouth."[66] We assume without deciding that Appellant's attack on the Government's evidence amounts to a sufficient showing of a deficiency of proof to initiate our factual sufficiency review. We nonetheless find the evidence factually sufficient to sustain Appellant's conviction for domestic violence.

In order to prove Appellant guilty of the lesser included offense of Specification 2 of Charge I, the Government had to prove beyond a reasonable doubt that: (1) Appellant committed a violent offense; and (2) the violent offense was committed against his spouse, intimate partner, or an immediate family member.[67] The term "violent offense" includes a violation of assault consummated by a battery under Article 128, UCMJ,[68] the elements of which are: (a) that the accused did bodily harm to a certain person; (b) that the bodily harm was done unlawfully; and (c) that the bodily harm was done with force or violence.[69]

Appellant argues that his conviction for domestic violence is factually insufficient because Dee lacked credibility, there was insufficient corroboration of her claims, and there was sufficient contradictory evidence to clearly convince this Court that the finding of guilt was against the weight of the evidence. We disagree. Dee credibly and convincingly testified that Appellant grabbed her by the throat, pushed her against a wall, and placed his hand over her

---

[64] *Id.*

[65] *Id.*

[66] Appellant's Brief at 42.

[67] *Manual for Courts-Martial, United States* (2023 ed.) (*MCM*) pt. IV, para. 78a.b(1).

[68] *MCM*, pt. IV, para. 78a.c.1.

[69] *MCM*, pt. IV, para. 77.b(2).

mouth and nose.[70] She immediately reported the battery to law enforcement officers, who observed her acting "scared and frantic."[71] She underwent a medical examination, and the treating PA observed bruises on her arm and neck.[72] Although Appellant demonstrated that Dee had a potential motive to fabricate the allegation against him in order to put her in a better position to gain custody of their children, when viewing the evidence as a whole, we are not "clearly convinced that the finding of guilty was against the weight of the evidence."[73] We therefore find that Appellant's conviction for domestic violence is factually sufficient.

## III. CONCLUSION

After careful consideration of the record, the briefs of appellate counsel, and the oral argument held on 18 March 2025, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[74] We note that the Entry of Judgment (EOJ) does not fully comply with R.C.M. 1111(b)(1), as it contains errors in the listing of some of Appellant's pleas and some of the findings. In accordance with R.C.M. 1111(c)(2), we therefore modify the EOJ and direct that it be included in the record.

The findings and sentence are **AFFIRMED**.



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[70] R. at 678–80.

[71] R. at 1039.

[72] R. at 1616–17.

[73] Article 66(d)(1)(B), UCMJ.

[74] Articles 59 & 66, UCMJ.

# United States Navy–Marine Corps Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | NMCCA NO. 202400331 |
| v. | **ENTRY OF JUDGMENT** |
| **Troy K. WILLIAMS**<br>**Staff Sergeant (E-6)**<br>**U.S. Marine Corps** | |
| *Accused* | *As Modified on Appeal* |
| | **28 April 2026** |

Between 4 March 2024 and 15 March 2024, the Accused was tried at Marine Corps Air Station Iwakuni, Japan, by a general court-martial, consisting of officer and enlisted members. Military Judge Benjamin Garcia presided.

## FINDINGS

The following are the Accused's pleas and the Court's findings to all offenses the convening authority referred to trial:

**Charge I: Violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. § 928b.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Specification 1: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 31 January 2023, commit a violent offense against D.W., the spouse of the accused, to wit: unlawfully throw a bottle at D.W. that contacted D.W. on the upper body.**

> *Plea:* Not Guilty.

> *Finding:* Not Guilty.

**Specification 2: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about**

**31 January 2023, commit an assault upon D.W., the spouse of the accused, by unlawfully (a) strangling and (b) suffocating her with his hands.**

*Plea:* Not Guilty.

*Finding:* Guilty to the Lesser Included Offense of Violent Offense: Assault Consummated by a Battery in violation of Article 128b.

**Specification 3: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 31 January 2023, commit an assault upon D.W., the spouse of the accused, by unlawfully strangling her with his hand.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 4: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 31 January 2023, commit a violent offense against D.W., the spouse of the accused, to wit: assault D.W. by punching at her with the accused's hand.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 5: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 27 September 2021, commit an assault upon D.W., the spouse of the accused, by unlawfully strangling her with his hands.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 6: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 27 September 2021, commit a violent offense against D.W., the spouse of the accused, to wit: assault D.W. by slapping her with the accused's hand.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 7: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 4 October 2019, commit an assault upon D.W., the spouse of the accused, by unlawfully strangling her with his hands.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Charge II: Violation of Article 115, Uniform Code of Military Justice, 10 U.S.C. § 915.**

*Plea:* Not Guilty.
*Finding:* Guilty.

**Specification: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 31 January 2023, wrongfully communicate to D.W. a threat, to wit: "I'm going to kill you," or words to that effect.**

*Plea:* Not Guilty.

*Finding:* Guilty.

**Charge III: Violation of Article 90, Uniform Code of Military Justice, 10 U.S.C. § 890.**

*Plea:* Not Entered.
*Finding:* Withdrawn and dismissed.

**Specification 1: In that Staff Sergeant Troy Williams, on active duty, having received a lawful command from Major T.W.S., his superior commissioned officer, then known by the accused to be his superior commissioned officer, to not initiate contact or communication with A.W., or words to that effect, did, at or near Iwakuni, Japan, on or about 5 March 2023, willfully disobey the same.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Specification 2: In that Staff Sergeant Troy Williams, on active duty, having received a lawful command from Major T.W.S., his superior commissioned officer, then known by the accused to be his superior commissioned officer, to not initiate contact or communication with D.W., or words to that effect, did, at or near Iwakuni, Japan, on or about 4 March 2023, willfully disobey the same.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Additional Charge I: Violation of Article 128b, Uniform Code of Military Justice, 10 U.S.C. § 928b.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 1: In that Staff Sergeant Troy Williams, on active duty, at or near Iwakuni, Japan, on or about March 2020, commit a violent offense against An. W., the immediate family member of the accused, to wit: unlawfully hit An. W, on the head with the accused's hand.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Specification 2: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 26 June 2021, commit an assault upon An. W., the immediate family member of the accused, by unlawfully strangling him with the accused's hand.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Specification 3: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 26 June 2021, commit a violent offense against An. W., the immediate family member of the accused, to wit: unlawfully hit An. W. on the body with (a) the accused's hand, and (b) a flip-flop.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Specification 4: In that Staff Sergeant Troy Williams, on active duty, did, at or near Iwakuni, Japan, on or about 27 September 2021, commit a violent offense against Am. W., the immediate family member of the accused, to wit: unlawfully hit Am. W. on the body with the accused's hands.**

*Plea:* Not Guilty.

*Finding:* Not Guilty.

**Additional Charge II: Violation of Article 119b, Uniform Code of Military Justice, 10 U.S.C. § 919b.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Specification 1: In that Staff Sergeant Troy Williams, on active duty, at or near Iwakuni, Japan, between on or about 4 October 2019 and 31 January 2023, had a duty of care of An. W., a child under the age of 16 years and did endanger the mental health, physical health, safety and welfare of said child by (a) hitting his mother D.W. in front of him, (b) strangling his mother D.W. in front of him, (c) pushing his mother D.W. in front of him, (d) threatening his mother D.W.'s life in front of him, (e) threatening his life, (f) threatening the lives of his siblings in front of him, (g) hitting him, and (h) strangling him, and that such conduct constituted culpable negligence, which resulted in harm, to wit: mental distress.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

**Specification 2: In that Staff Sergeant Troy Williams, on active duty, at or near Iwakuni, Japan, between on or about 4 October 2019 and 31 January 2023, had a duty of care of Am. W., a child under the age of 16 years and did endanger the mental health, physical health, safety and welfare of said child by (a) hitting her mother D.W. in front of her, (b) strangling her mother D.W. in front of her, (c) pushing her mother D.W. in front of her, (d) threatening her mother D.W.'s life in front of her, (e) threatening her life, (f) threatening the lives of her siblings in front of her, and (g) hitting her, and that such conduct constituted culpable negligence, which resulted in harm, to wit: mental distress.**

*Plea:* Not Entered.

*Finding:* Withdrawn and dismissed.

## SENTENCE

On 15 March 2024, members sentenced the Accused to the following:

**Confinement for a total of 3 months.**

**Period and limits of restriction of 2 months restriction to base.**

**Hard labor for a period of 3 months.**

The Accused served 5 days of pretrial confinement and was credited with 5 days of confinement already served, to be deducted from the adjudged sentence to confinement.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court